FILED
2023 Mar-29 PM 01:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA MAE FROMAN,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-110-AMM** |
| | ) | |
| **COOPERSURGICAL, INC.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This case is before the court on a motion to dismiss by Defendant CooperSurgical, Inc. ("CooperSurgical"), Doc. 40; a motion to strike by Plaintiffs Brianna Mae Froman and Christopher Froman (collectively, "the Fromans"), Doc. 44; a motion for leave to file a reply brief out of time by CooperSurgical, Doc. 45; a motion to dismiss by Defendant Femcare, LTD ("Femcare"), Doc. 51; and a request for leave to conduct jurisdictional discovery by the Fromans, Doc. 56 at 15 n.25.

For the reasons stated below, Femcare's motion to dismiss, Doc. 51, is **GRANTED**. The Fromans' request for leave to conduct jurisdictional discovery, Doc. 56 at 15 n.25, is **DENIED**. The Fromans' motion to strike, Doc. 44, is **DENIED**. CooperSurgical's motion for leave to file a reply brief out of time, Doc. 45, is **GRANTED**. CooperSurgical's motion to dismiss, Doc. 40, is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

### A. Factual Allegations

These are the material facts that the Fromans alleged in their amended complaint, viewed in the light most favorable to the Fromans:

"This c[ase] arises from Ms. Froman's Filshie Clip tubal ligation procedure which . . . resulted in a series of damages." Doc. 39 ¶ 3. "Femcare is the manufacturer of the Filshie Clip system[]" and maintains "its principal place of business" in the United Kingdom. *Id*. ¶¶ 6, 45.

"During the times relevant to this litigation . . . , CooperSurgical imported, distributed, marketed, and sold the Filshie Clip system in the United States." *Id*. ¶ 46; *see also* Doc. 56-3 ("the distribution agreement").[1] The distribution agreement includes a warranty by Femcare that the Filshie Clips "comply with the requirements of the related FDA [a]pproval." Doc. 56-3 § 9.1(A). During briefing, the Fromans asserted that "Femcare has sold 12 million Filshie Clips worldwide" and that there are "4 million [Filshie Clips] in the" United States. Doc. 56 at 13.

Filshie Clips are "a female birth control device" that utilizes "titanium clip[s] with silicone rubber lining" to "cause . . . blockage . . . of the fallopian tubes." Doc.

---

[1] The distribution agreement is between "Avalon Medical Corp." and "Femcare Limited." *See* Doc. 56-3 at 1. The parties appear in agreement that "CooperSurgical acquired Avalon [Medical Corp.] on October 23, 2003" and assumed responsibilities under this agreement. *See* Doc. 56 at 9 & n.11; *see also* Doc. 61 at 5.

39 ¶¶ 16–17. "[I]f all goes as planned," Filshie Clips are clipped "around each of the fallopian tubes" and "exert[] continued pressure on the fallopian tube[s]" until the tubes "decrease[] in size" or close. *Id.* ¶¶ 16–18. Filshie Clips are designed to be "a long-acting" and "permanent[]" "form of birth control." *Id.* ¶ 20.

The Food and Drug Administration ("FDA") classifies Filshie Clips "as a Class III medical device," which requires "the FDA [to] evaluate[] Filshie Clips' safety and effectiveness prior to granting the product conditional approval." *Id.* ¶ 23. In 1996, the FDA granted Femcare conditional premarket approval of the Filshie Clips system. *Id.* ¶ 21. The premarket approval "imposed certain conditions on Femcare's sale of the product, including certain labeling requirements and restrictions on false or misleading advertising." *Id.* ¶ 25.

In 2013, "Ms. Froman underwent a tubal ligation procedure" which "used Filshie Clips." *Id.* ¶¶ 59–60. Before her procedure, Ms. Froman "was provided with a [d]isclosure and [c]onsent for medical and surgical procedure which included generic risks and hazards associated with [her] procedure," but "[n]o mention was made of the risk of migration and the appurtenant damages that could be caused by the Filshie Clips." *Id.* ¶ 61.

"[A]fter her tubal ligation surgery . . . , Ms. Froman began experiencing extreme pain in her lower abdominal/pelvic region." *Id.* ¶ 64. Ms. Froman "dealt with this pain for years and was unable to locate a doctor to identify what was wrong

with her." *Id*. In 2020, "Ms. Froman experienced pain so excruciating [that] she was forced to . . . go to the emergency room" and "underwent surgery." *Id*. ¶¶ 65–66. The surgery "revealed" that Ms. Froman's "Filshie Clips had . . . migrated to the top of [her] abdomen" and "had also damaged key blood vessels in [her] uterus." *Id*. ¶ 66. "[T]he surgeon was able to successfully remove the migrated Filshie Clips from Ms. Froman's body." *Id*. ¶ 67. Although Ms. Froman's "pain has . . . substantially subsided, . . . the damage caused by the migrating Filshie Clips persists and she continues to experience side effects from the damaged blood vessels in her uterus." *Id*.

The Fromans allege that Ms. Froman's experience is not unique. According to the Fromans, "[m]igration of the clips following a normal application is estimated to occur over 25% of the time." *Id*. ¶ 48. Despite the clips' "propensity to migrate after being placed on the fallopian tubes," CooperSurgical and Femcare "neither warned nor adequately informed [the Fromans] nor their healthcare providers how frequently these migrations occur or the severity and permanency of the potential injuries." *Id*. ¶¶ 48–49.

The Fromans further allege that CooperSurgical and Femcare failed to provide adequate warnings "even though [both companies] had received adverse reports and knew or should have known Filshie Clips had a significant propensity to migrate." *Id*. During the FDA premarket approval process, the Fromans allege that the

companies "reported to the FDA that the Filshie Clip System had a migration incidence of .13%." *Id*. ¶ 53. "[S]ince the initial [premarket approval]," "the risk of clip migration [has] . . . continued to increase from year to year," yet neither Femcare nor CooperSurgical have "address[ed] the Filshie Clips['] safety issues." *Id*. ¶ 54.

The Fromans allege that Femcare and CooperSurgical breached their duties to (1) "act as reasonable manufacturers, importers, distributors, and sellers of Class III medical devices;" (2) "continually monitor [the Filshie Clip System] product;" and (3) "continually test their product [to] ensure it was safe and would perform as intended." *Id*. ¶ 56. The Fromans further allege that Femcare and CooperSurgical breached their "dut[ies] to accurately report and update the FDA" on "the migration issues involved with the Filshie Clip Systems." *Id*. ¶ 57. The Fromans allege that these breaches caused Ms. Froman's injuries. *Id.* ¶ 72.

### B. Procedural History

The Fromans filed their original complaint against CooperSurgical; Femcare; Utah Medical Products, Inc. (the parent corporation of Femcare); and The Cooper Companies, Inc. (the parent corporation of Cooper Medical Inc., which is the parent corporation of CooperSurgical, *see* Doc. 19 at 8). *See* Doc. 1. All defendants except Femcare, who had not yet been served, moved to dismiss. *See* Doc. 16; Doc. 17; Doc. 18; Doc. 19; Doc. 20; Doc. 21.

Judge Kallon "dismissed" "the Fromans' claims against Utah Medical Products and The Cooper Companies" in their "entirety for lack of personal jurisdiction" and ordered the Fromans to "replead their allegations against CooperSurgical." Doc. 36 at 1. Judge Kallon held that the Fromans' claims were impliedly and expressly preempted as pleaded and that "[t]he Fromans' complaint [wa]s also an impermissible shotgun pleading." *Id*. at 15–19.

The Fromans timely filed their amended complaint. *See* Doc. 39. The amended complaint alleges six claims against CooperSurgical and Femcare: product liability/defective design under the Alabama Extended Manufacturer's Liability Doctrine (Counts 1 and 7); negligence (Counts 2 and 8); strict liability (Counts 3 and 9); failure to warn (Counts 4 and 10); gross negligence (Counts 5 and 11); and punitive damages (Counts 6 and 12).

The five pending motions ensued. *First*, CooperSurgical moved to dismiss the amended complaint because "all of [the Fromans'] claims are preempted" and because the Fromans' "allegations fail to state a claim under Alabama law." Doc. 41 at 1, 6. *Second*, the Fromans moved to strike CooperSurgical's reply brief, Doc. 43, because the reply brief was filed "four days after it was due" under the briefing schedule in Judge Kallon's standing order, Doc. 44 ¶ 3; *see also* Doc. 24. *Third* and in opposition to the motion to strike, CooperSurgical moved for leave to file its reply brief out of time. Doc. 45. *Fourth*, Femcare moved to dismiss the amended

complaint on personal jurisdiction and preemption grounds. *See* Doc. 51. *Fifth* and in opposition to Femcare's motion to dismiss, the Fromans requested leave to conduct jurisdictional discovery. Doc. 56 at 15 n.25.

During briefing, this action was reassigned from Judge Kallon to the undersigned judge. *See* Doc. 47.

## II.    STANDARD OF REVIEW

### A. Femcare's Motion to Dismiss

"The plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction over a nonresident defendant." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002). "A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Id.* at 1269 (cleaned up).

"Where, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.*

### B. CooperSurgical's Motion to Dismiss

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations"; its purpose is only to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. To test the complaint, the court discards any "conclusory allegations," takes the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw[s] all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### III.  ANALYSIS

#### A. Femcare's Motion to Dismiss

"The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) ("*Ford Motor*"). Federal "courts . . . analyze personal jurisdiction under the Fifth Amendment using the same basic standards and tests that apply under the Fourteenth Amendment." *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022), *cert. denied sub nom. Gomez v. Teck Res. Ltd.*, 143 S. Ct. 736 (2023).

The personal jurisdiction analysis ordinarily entails two inquiries. The first is "whether the [state's] long-arm statute provides a basis for personal jurisdiction." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (2023) (cleaned up). "This case presents no need to examine Alabama's long-arm jurisdictional statute because that statute authorizes a court to assert personal jurisdiction to the limits of federal due process." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 n.3 (11th Cir. 1988). Accordingly, the court proceeds directly to the second inquiry: "whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *SkyHop Techs., Inc*, 58 F.4th at 1222 (cleaned up).

"To determine whether the exercise of specific jurisdiction affords due process, [federal courts] apply a three-part test." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018). "First, [federal courts] consider whether the plaintiffs have established that their claims arise out of or relate to at least one of the defendant's contacts with the forum." *Id*. (cleaned up). "Second, [federal courts] ask whether the plaintiffs have demonstrated that the defendant purposefully availed itself of the privilege of conducting activities within the forum state." *Id*. (cleaned up). "If the plaintiffs carry their burden of establishing the first two prongs," federal courts "next consider whether the defendant has made a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id*. (cleaned up).

"The first inquiry—whether the claims arise out of or relate to one of the defendant's contacts—does not require direct causation." *SkyHop Techs., Inc*, 58 F.4th at 1229 (cleaned up). "Rather, it contemplates that some relationships will support jurisdiction without a causal showing." *Id*. (cleaned up). "So [federal courts] focus on the essential foundation of specific jurisdiction—whether there is a strong relationship among the defendant, the forum, and the litigation." *Id*. (cleaned up). "The principal way to establish this relationship is through an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id*. (cleaned up).

"At the second inquiry, [federal courts] consider whether [a defendant] purposefully availed itself of the benefit of [the forum state's] laws." *Id.* at 1230. "To support purposeful availment, the defendant must have had contacts with the forum that were his own choice and not random, isolated, or fortuitous." *Id.* (cleaned up). A defendant makes the requisite contact with the forum state by, *e.g.*, "physical[ly] ent[ering] into the State—either by the defendant in person or through an agent, goods, mail, or some other means," or by "entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (cleaned up).

The court finds that it does not have jurisdiction over Femcare on two separate and independent grounds. *First,* the court discards as conclusory the allegations in the complaint about Femcare and Alabama. *See* Doc. 39 ¶¶ 11–13. The Fromans allege that Femcare "purposefully availed [itself] of the privilege of conducting business in the State of Alabama," "intend[ed] that [its products] be used by medical professionals treating patients in Alabama," and "conducted and continue to regularly conduct substantial business within the State of Alabama." *Id*. The Eleventh Circuit has held that similar allegations are "vague and conclusory," *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 & n.3 (11th Cir. 2006), and on a motion to dismiss, conclusory allegations are discarded and are not entitled to the presumption of truth, *see McCullough*, 907 F.3d at 1333.

In opposition to Femcare's motion, the Fromans provided the court a copy of the distribution agreement between Femcare and CooperSurgical. *See* Doc. 56-3. The Fromans did not incorporate the distribution agreement into their amended complaint or reference specific terms of the agreement in their pleaded allegations. *See generally* Doc. 39. Although the Fromans are permitted to "produce evidence supporting jurisdiction," *see Meier*, 288 F.3d at 1269, the Fromans' ability to produce evidence in opposition to a personal jurisdiction challenge does not supplant the Fromans' initial obligation to plead a non-conclusory basis for this court to assert jurisdiction over Femcare, *see Snow*, 450 F.3d at 1318. Because the complaint is devoid of any non-conclusory allegations that connect Femcare's conduct to the state of Alabama, the court finds that the Fromans have not pleaded that this court has jurisdiction over Femcare, and Femcare's motion to dismiss is **GRANTED** on that basis.

*Second*, the court finds that the Fromans have not "carr[ied] their burden of establishing the first two prongs" of the personal jurisdiction inquiry. *See Waite*, 901 F.3d at 1313. Femcare asserts that it "does no business, whether involving Filshie Clips or otherwise, in the State of Alabama." Doc. 52 at 5; *see also* Doc. 52-1 ¶¶ 7–14. The Fromans respond that because Femcare contracted with CooperSurgical to sell the Filshie Clips throughout the United States, Femcare is subject to personal

jurisdiction in every state in the United States where the Filshie Clips were sold. *See* Doc. 56 at 15.

The parties' briefs present conflicting interpretations of the most analogous Supreme Court precedent, *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) ("*McIntyre*"). *Compare* Doc. 52 at 6–8, *with* Doc. 56 at 11–13. *McIntyre* lacked a majority opinion, so "the only opinion that will be considered precedential" is the narrower of the plurality opinion and the concurring opinion, Bryan A. Garner et al., *The Law of Judicial Precedent* § 20, at 196 (2016), which is the concurring opinion of Justice Breyer that Justice Alito joined, *see McIntyre*, 564 U.S. at 887– 93 (Breyer, J., concurring). *See In re Reaves*, No. 22-11925-F, 2022 WL 2952475, at *2 n.1 (11th Cir. July 8, 2022) ("When the Supreme Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (cleaned up).

In *McIntyre*, the plaintiff "seriously injured his hand [in New Jersey] while using a metal-shearing machine manufactured" by a foreign manufacturer and imported to the United States by "an independent company." 564 U.S. at 878. "[T]he Supreme Court of New Jersey . . . held that New Jersey's courts c[ould] exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer 'knows or reasonably should know that its products are distributed through a

nationwide distribution system that might lead to those products being sold in any of the fifty states.'" *McIntyre*, 564 U.S. at 877 (quoting *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 592 (N.J. 2011)).

A plurality of the Court held that the standard imposed by the Supreme Court of New Jersey "c[ould not] be sustained" because the plaintiff did "not establish[] that" the manufacturer "engaged in conduct purposefully directed at New Jersey." *McIntyre*, 564 U.S. at 877, 886. The plurality reasoned that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum." *Id*. at 882. The plurality further reasoned that "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id*.

Justice Breyer also rejected "the absolute approach adopted by the New Jersey Supreme Court" and decided the case by "adhering to [the Court's] precedents." *Id*. at 890–91 (Breyer, J., concurring). Justice Breyer reasoned that "a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction." *Id*. at 888. According to Justice Breyer, a plaintiff "bears the burden of proving jurisdiction" and may meet this burden by "show[ing a] specific effort by the [foreign defendant] to sell [its product] in" the forum state. *Id*. at 889.

The court agrees with the Fromans that Femcare—a manufacturer that "has sold 12 million Filshie Clips worldwide" and "4 million in the U.S."—stands in a different position than the foreign manufacturer in *McIntyre* who only had one product in the forum state. *Compare* Doc. 56 at 13, *with McIntyre* 564 U.S. at 888 (Breyer, J., concurring). But the court cannot accept the Fromans' argument that because Femcare's distributor sold many Femcare products throughout the United States, Femcare has specifically targeted Alabama. *See* Doc. 56 at 13–14. "Th[e Supreme] Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *McIntyre*, 564 U.S. at 883; *accord id*. at 888–89 (Breyer, J., concurring). Indeed, the Fromans' argument echoes the one considered and rejected by both the plurality opinion and Justice Breyer's concurrence in *McIntyre*. *Compare McIntyre*, 564 U.S. at 877 (plurality opinion) (rejecting a rule that equates a defendant's awareness of "nationwide distribution" with an effort by it to specifically target the forum state) (cleaned up), *and id*. at 890–91 (Breyer, J., concurring) (rejecting the "absolute approach" that turns on nationwide distribution), *with* Doc. 56 at 14 ("[B]ecause [Femcare] intends to sell its product throughout the entire United States – this equates to manufacturing a product in anticipation of sales in Alabama.") (cleaned up).

The Fromans rely on *King v. General Motors Corporation* for the proposition that "because [Femcare] intends to sell its product throughout the entire United States – 'this equates to manufacturing a product in anticipation of sales in Alabama.'" *Id*. (quoting 5:11–cv–2269–AKK, 2012 WL 1340066, at *7 (N.D. Ala. Apr. 18, 2012)) (cleaned up). But close reading of *King*, which is not binding on this court, reveals it is inapposite.

In *King*, the plaintiff filed a wrongful death action against GM Canada and its parent corporation, GM Corporation, alleging that a manufacturing defect in a vehicle caused his wife's death. 2012 WL 1340066, at *1. GM Canada, a Canadian corporation, manufactured the allegedly defective vehicle, and GM Corporation distributed the vehicle to a dealership in Alabama. *Id*. at *1, *5. Relying on *McIntyre*, GM Canada asserted that "it never purposefully availed itself to the privilege of conducting activities in Alabama" and that Alabama, therefore, did not have personal jurisdiction over it. *Id*. at *6 (cleaned up).

The "court disagree[d]" and found two facts dispositive to its analysis. *Id*. at *6–8. *First*, the court observed that "[u]nlike the manufacture in *McIntyre* who utilized an independent U.S. distributor . . . , GM Canada utilized its parent corporation to distribute . . . vehicles to . . . Alabama." *Id*. at *7. *Second*, the court observed that GM Canada "specifically manufacture[d] GM vehicles . . . to comply with federal regulations" and "not the Canada Motor Vehicle Safety Standards . . .

to be distributed in Canada." *Id.* at \*5, \*7. The court held that because GM Canada "built certain vehicles for GM Corporation to distribute specifically in the United States, including Alabama," GM Canada "c[ould not] genuinely maintain that it d[id] not serve the Alabama market." *Id.* at \*8. And "given GM Canada's relationship with its . . . parent corporation, the court f[ound] it reasonable to exercise jurisdiction" over GM Canada. *Id.*

Neither fact that was central to the court's analysis in *King* is present here. *First*, Femcare and CooperSurgical do not have a parent/subsidiary relationship. Instead, Femcare and CooperSurgical are governed by the distribution agreement. *See* Doc. 56-3. The Fromans assert that this distribution agreement evidences Femcare's "active role in the marketing, distribution, and sale of [Filshie Clips] in the United States." Doc. 56 at 15. But the terms of the distribution agreement do not support this assertion. *See* Doc. 56-3.

According to the distribution agreement, CooperSurgical received all Filshie Clips from England and was responsible for transporting the product into the United States. *Id.* § 4.6. CooperSurgical was "entitled to promote[,] . . . sell," "label[]," and "package[]" the Filshie Clips "in such manner as [CooperSurgical] . . . th[ought] fit." *Id.* § 5.1. CooperSurgical was required to "use its best endeavors to ensure compliance with the terms and conditions of FDA Approval with respect to the sale, advertising[,] and promotion of the [Filshie Clips] in the" United States. *Id.* § 5.2.

CooperSurgical was required to "maintain or use an active trained sales force" and "provide an after sales service for customers in relation to the [Filshie Clips] as determined in [its] sole discretion." *Id*. §§ 5.5.5–.6. Finally, CooperSurgical was required to "make clear in all dealings with customers and prospective customers that it [wa]s acting as distributor of the [Filshie Clips] and not as [an] agent of" Femcare. *Id*. § 5.5.1. Accordingly, the Fromans cannot carry their burden of establishing that personal jurisdiction is proper in Alabama based on the terms of the distribution agreement.

*Second*, the Fromans did not allege that Femcare manufactured its Filshie Clips with a specific eye towards the American market. In *King*, GM Canada manufactured some of its vehicles so that the vehicles complied with vehicular regulations specific to the United States rather than regulations in Canada. 2012 WL 1340066, at *5, *7. The distribution agreement includes a warranty by Femcare that the Filshie Clips "comply with the requirements of the related FDA [a]pproval." Doc. 56-3 § 9.1(A). But Femcare asserts—and the Fromans do not contradict—that Femcare manufactured the Filshie Clips "in compliance with varying regulations from around the world for worldwide sale, distribution, and use, not specifically for U.S. distribution." Doc. 61 at 3. Based on the evidence before the court, the Fromans have not "carr[ied] their burden of establishing" that Femcare specifically targeted Alabama. *See Waite*, 901 F.3d at 1313.

The parties submit persuasive authority from three other district courts that have considered whether Femcare has purposefully availed itself of each forum. *See* Doc. 56 at 9 n.10 (citing *Bulox v. CooperSurgical*, *Inc.*, No. CV H-21-2320, 2022 WL 2132680, at *1 (S.D. Tex. June 14, 2022) (holding that Femcare was "subject to the court's jurisdiction")); Doc. 61 at 1 n.1 (citing *Watters v. CooperSurgical, Inc.*, No. 5:22-CV-223-D, 2023 WL 1982347, at *4 (E.D.N.C. Feb. 13, 2023) (holding that "the court lack[ed] personal jurisdiction over Femcare"); Doc. 62 ¶ 6 (citing *Bergdoll v. CooperSurgical, Inc.*, Case No. 6:22-cv-3018-MDH, 2023 WL 2167417, at *5–6 (W.D. Mo. Feb. 22, 2023) (holding that "Femcare has sufficient minimum contacts in Missouri to avail itself to personal jurisdiction in this Court"); Doc. 63 ¶ 6 (citing *Mack v. CooperSurgical, Inc.*, No. 1:22-cv-54-RAH, 2023 WL 2653365, at *5–6 (M.D. Ala. Mar. 27, 2023) (holding that Femcare "fail[ed] to persuade the [c]ourt that the case should be dismissed" on personal jurisdiction grounds "at this stage").

The *Bulox* court provided little reasoning. *See Bulox*, 2022 WL 2132680, at *1. And the *Bergdoll* court and the *Mack* court did not discuss *McIntyre*. *See Bergdoll*, 2023 WL 2167417, at *6; *see also Mack*, 2023 WL 2653365, at *5–6. In holding that Femcare was not subject to North Carolina's jurisdiction, the *Watters* court reasoned that "a defendant-manufacturer who sells a product to a distributor with no direct purpose that the product reach the forum state is not subject to personal

jurisdiction" because "abstract[] aware[ness] that a distributor could sell [the manfacturer's] product in the forum state" is not the same as "engag[ing] in some activity purposely directed at the forum state." *Watters*, 2023 WL 1982347, at *4 (cleaned up).

Ultimately, the parties' analysis does not definitively tell the court what to do with Femcare's motion. On the one hand, personal jurisdiction is a forum-specific inquiry. *See SkyHop Techs., Inc*, 58 F.4th at 1229. The court cannot adhere to this rule and deny Femcare's motion. A denial would effectively hold that Femcare is subject to personal jurisdiction in all states solely because it manufactured the Filshie Clips in the United Kingdom and contracted with CooperSurgical to distribute the Filshie Clips throughout the United States as CooperSurgical saw fit.

On the other hand, accepting the Fromans' assertion that more than four million Filshie Clips have been sold in the United States, *see* Doc. 56 at 13, the court cannot grant Femcare's motion solely on the basis of *McIntyre*, which (1) involved substantially fewer sales in the asserted jurisdiction, (2) did not consider whether the foreign manufacturer's warranty that the product complied with applicable federal regulations in the United States supplied a basis to find that the manufacturer had sufficient contacts with an American state or federal jurisdiction, and (3) resulted in a plurality opinion in any event. *See generally McIntyre*, 564 U.S. 873.

The dissent in *McIntyre* confirms that the precedent does not resolve this case. *See* 564 U.S. at 893–910 (Ginsburg, J., dissenting, joined by Justices Sotomayor and Kagan). The dissenting justices posed the following as a hypothetical:

> A foreign industrialist seeks to develop a market in the United States for machines it manufactures. It hopes to derive substantial revenue from sales it makes to United States purchasers. Where in the United States buyers reside does not matter to this manufacturer. Its goal is simply to sell as much as it can, wherever it can. It excludes no region or State from the market it wishes to reach. . . . [The foreign manufacturer] engages a U.S. distributor to ship its machines stateside. Has [the foreign manufacturer] . . . escap[ed] personal jurisdiction in a State where one of its products is sold and causes injury . . . to a local user?

*Id*. at 893; *but see id*. (observing that "perhaps" a manufacturer would be subject to personal jurisdiction "in States where its products are sold in sizeable quantities"). That question, which was merely hypothetical in *McIntyre*, is now before this court.

Accordingly, the court returns to the most recent Supreme Court precedent that commanded a clear majority about personal jurisdiction over manufacturers based on their nationwide conduct: *Ford Motor*, 141 S.Ct. 1017.

In *Ford Motor*, the Supreme Court clarified the requisite causal relationship between a defendant's in-state activity and the litigation to maintain personal jurisdiction over the defendant. In that decision (which included two cases), plaintiffs asserted products-liability claims against Ford Motor Company ("Ford") for injuries "stemming from . . . car accident[s]." *Id*. at 1022. "The accident[s] happened in the State[s] where [each] suit was brought[,]" the plaintiffs were

residents of each forum State, and "Ford did substantial business in the State," including "advertising, selling, and servicing the model of vehicle the [plaintiffs alleged wa]s defective." *Id*. "Ford contend[ed] that [personal] jurisdiction [wa]s improper because the particular car[s] involved in the crash[es] w[ere] not first sold in [each plaintiff's] forum State, nor w[ere the cars] designed or manufactured there." *Id*. The Supreme Court "reject[ed] that argument" and held that "[w]hen a company like Ford serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id*.

Ford's national and global conduct was integral to the Court's analysis. The Supreme Court observed that although Ford "is incorporated in Delaware and headquartered in Michigan," "its business is everywhere." *Id*. "Ford markets, sells, and services its products across the United States and overseas[]" and "engages in wide-ranging promotional activities." *Id*. The Court observed that it was a "[s]mall wonder that Ford . . . conceded purposeful availment of the [forum] States' markets[]" because "[b]y every means imaginable[,] . . . Ford urges" residents of the forum States "to buy its vehicles," maintains dealerships in the forum States, and "works hard to foster ongoing connections to its cars' owners." *Id*. at 1028 (cleaned up). Not only do "[t]hose activities[] . . . make Ford money[,]" Ford's activities "mak[e] it easier to own a Ford" and "encourage" individuals "to become lifelong"

consumers of Ford's products. *Id*. (cleaned up). Accordingly, the Court concluded that "the reach of Ford's . . . contacts[] underscore[s] the aptness of finding jurisdiction" in each forum State, "even though the cars at issue were first sold out of state." *Id*. at 1029.

This case is different than *Ford Motor* in an important respect: unlike Ford, which "conceded purposeful availment of the [forum] States' markets[]," *id*. at 1028, Femcare contends that it did not purposefully avail itself of Alabama's markets, *see* Doc. 52 at 5; *see also* Doc. 52-1 ¶¶ 7–14. And the apparent reason for Ford's concession in *Ford Motor*, "the reach of [its] . . . contacts," 141 S.Ct. at 1029, is the reason why jurisdiction over Femcare is improper here.

The amended complaint alleges that Femcare is a foreign manufacturer of the Filshie Clips and that "[d]uring the times relevant to this litigation . . . , CooperSurgical imported, distributed, marketed, and sold the Filshie Clip system in the United States." Doc. 39 ¶¶ 6, 45–46; *accord* Doc. 56-3 § 4.6. The distribution agreement empowers CooperSurgical to promote, sell, label, and package the Filshie Clips "as it may think fit" and to "use its best endeavors to ensure compliance with the terms and conditions of FDA Approval with respect to the sale, advertising[,] and promotion of the [Filshie Clips] in the" United States. Doc. 56-3 §§ 5.1–.2. The distribution agreement further provides for CooperSurgical to manage sales and customer service "in [its] sole discretion." *Id*. §§ 5.5.5–.6. The only obligation

Femcare has in the distribution agreement that connects its conduct with the United States is Femcare's warranty to CooperSurgical that the Filshie Clips "comply with the requirements of the related FDA Approval." *Id*. § 9.1(A).

Ford's "business [wa]s everywhere," *Ford Motor*, 141 S.Ct. at 1022, but Femcare's is not. And neither the amended complaint nor the terms of the distribution agreement establish a "strong relationship" between Femcare's conduct and Alabama. *See SkyHop Techs., Inc*, 58 F.4th at 1229 (cleaned up). Accordingly, this court does not have personal jurisdiction over Femcare, and Femcare's motion to dismiss is **GRANTED** on two separate and independent bases: *first*, the amended complaint does not plead a non-conclusory basis for personal jurisdiction, and *second*, the Fromans have not carried their burden of establishing personal jurisdiction in any event.

### B. The Fromans' Request For Jurisdictional Discovery

In a footnote, the Fromans request that the court "grant them leave to conduct jurisdictional discovery." Doc. 56 at 15 n.25. In this Circuit, "when facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute, parties have a qualified right to jurisdictional discovery." *Am. Civ. Liberties Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) (cleaned up). The Fromans do not make any argument regarding why they might have a "qualified right to jurisdictional discovery." *See id*. (cleaned up); *see generally* Doc. 56 at 15

n.25. In any event, the court finds that it does not have the discretion to grant discovery on this issue. *See Butler v. Sukhoi Co.*, 579 F.3d 1307, 1314 (11th Cir. 2009).

The Eleventh Circuit has held that when a complaint is "insufficient as a matter of law to establish a *prima facie* case that the district court had jurisdiction," a district court "abuse[s] its discretion" if the court "allow[s] the case to proceed and grant[s] discovery on the jurisdictional issue." *Butler*, 579 F.3d at 1314. Further, district courts in this Circuit have held that litigants are not "entitled to [jurisdictional] discovery solely to buttress the conclusory jurisdictional allegations in the[ir c]omplaints." *See*, *e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-2924, 2020 WL 6907056, at *6 (S.D. Fla. Nov. 24, 2020); *accord Snow*, 450 F.3d at 1318 ("[V]ague and conclusory allegations . . . are insufficient to establish a *prima facie* case of personal jurisdiction over [a litigant]."); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280–81 (11th Cir. 2009) (holding that the district court did not abuse its discretion in dismissing an action without jurisdictional discovery when a litigant "buried such requests in its briefs as a proposed alternative to dismiss[al]").

The Fromans' complaint alleges that "Femcare is the manufacturer of the Filshie Clip system[]" and that Femcare "is a UK subsidiary of Utah Medical Products, Inc. with its principal place of business" in the United Kingdom. Doc. 39 ¶¶ 6, 45. Further, the Fromans allege that "[d]uring all times relevant to this litigation

and until 2019, CooperSurgical imported, distributed, marketed, and sold the Filshie Clip system in the United States." *Id*. ¶ 46. The complaint contains allegations about Femcare and Alabama, *see id*. ¶¶ 11–13, but these allegations are conclusory and must be discarded, *see McCullough* 907 F.3d at 1333; *accord Snow*, 450 F.3d at 1318.

Because the complaint is devoid of any non-conclusory allegations that connect Femcare's conduct to the state of Alabama, *see generally* Doc. 39, the court lacks discretion to "grant[] discovery on the jurisdictional issue," *see Butler*, 579 F.3d at 1314; *accord Snow*, 450 F.3d at 1318. Accordingly, the Fromans' request is **DENIED**.

### C. The Fromans' Motion to Strike & CooperSurgical's Request for Leave to File Its Reply Brief Out of Time

The Fromans' motion to strike arises from a difference between the briefing schedule in Judge Kallon's standing scheduling order, Doc. 24 at 2–7, and the briefing schedule Judge Kallon set for CooperSurgical's initial motion to dismiss, *id*. at 1. The standing scheduling order provides the following schedule: "[t]he movant's reply brief shall be filed not later than **three (3) calendar** days after the date on which the opponent's responsive brief was due, unless otherwise ordered by the court." *Id*. at 4. For CooperSurgical's initial motion to dismiss, Judge Kallon modified this schedule and made the reply brief due within seven days of the Fromans' responsive brief. *Id*. at 1.

For CooperSurgical's pending motion to dismiss, Doc. 40, the Fromans filed their responsive brief on August 12, 2022. *See* Doc. 42. CooperSurgical filed its reply brief on August 19, 2022. *See* Doc. 43. The Fromans move to strike the reply brief because the reply brief was filed four days late under Judge Kallon's standing scheduling order. *See* Doc. 44 at 1–2; *see also* Doc. 24 at 2–7.

CooperSurgical concedes that its reply brief is untimely under Judge Kallon's standing scheduling order and asserts that it "adhered to the briefing schedule entered by [Judge Kallon] on the initial Motion to Dismiss." Doc. 45 ¶ 1; *see also* Doc. 24 at 1. Because CooperSurgical's delay was short, grounded in a reasonable misinterpretation of the applicable briefing schedule, and the Fromans have not asserted that they suffered any prejudice by the untimely filing, *see* Doc. 44, the motion to strike is **DENIED**. Accordingly, CooperSurgical's motion for leave to file its reply out of time, Doc. 45, is **GRANTED**.

### D. CooperSurgical's Motion to Dismiss

"Congress enacted the Medical Device Amendments [("MDA")] to the Federal Food, Drug, and Cosmetic Act to 'provide for the safety and effectiveness of medical devices intended for human use.'" *Jacob v. Mentor Worldwide, LLC*, 40 F.4th 1329, 1332 (11th Cir. 2022) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 474 (1996)). "The [MDA] establish[es] three classes of medical devices—Class I, Class II, and Class III—based on the level of oversight required to ensure their

safety." *Jacob*, 40 F.4th at 1332; *see also* 21 U.S.C. § 360c(a)(1). "Classification is based on the level of risk posed by the device." *Jacob*, 40 F.4th at 1332. Filshie Clips, as a Class III device, *see* Doc. 39 ¶ 23, "involve the most risk and require general regulatory controls and pre-market approval before being sold to consumers," *Jacob*, 40 F.4th at 1332.

After a Class III device receives the FDA's pre-market approval, the MDA "forbid[s] unauthorized changes to design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id*. at 1333 (cleaned up). Further, "[m]akers of approved devices are also subject to ongoing reporting requirements related to device safety." *Id*. "For example, a manufacturer must inform the FDA of studies of its devices and incidents of the device injuring consumers." *Id*. "The FDA retains authority to withdraw its approval based on this information." *Id*.

"To ensure that FDA oversight is not undermined by state law, Congress included an express preemption provision in the" MDA. *Id*. at 1335; *see also* 21 U.S.C. § 360k(a). There is "a two-step process for analyzing the . . . express preemption provision." *Jacob*, 40 F.4th at 1335. "First, a court must decide whether the FDA has established requirements specific to the device at issue. *Id*. (cleaned up). "[A]ny device that goes through premarket approval will necessarily have federally established requirements." *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319,

1326 (11th Cir. 2017). Because Filshie Clips are subject to premarket approval, *see* Doc. 39 ¶¶ 21–23, the first step of express preemption is satisfied for all the Fromans' claims. *Mink*, 860 F.3d at 1326.

The second step of the of the express preemption analysis considers "whether the state-law claim would impose any requirement that relates to the safety or effectiveness of the device and is different from, or in addition to the federal requirement." *Jacob*, 40 F.4th at 1335 (cleaned up). "If the court answers yes at both steps, the claim is expressly preempted." *Id.* (cleaned up).

The express preemption provision of the MDA "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations provided that the state duties in such a case parallel, rather than add to, federal requirements." *Id.* (cleaned up). "For a state requirement to 'parallel' a federal requirement and avoid express preemption under [the MDA], the requirements must be 'genuinely equivalent.'" *Id.* at 1336 (quoting *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1300 (11th Cir. 2011)). "Ordinarily, state and federal requirements are not equivalent if a manufacturer could be held liable under state law without having violated federal law." *Jacob*, 40 F.4th at 1336.

"The [MDA] also contain[s] an implied preemption provision." *Id.*; *see also* 21 U.S.C. § 337(a). Under the implied preemption provision, "a plaintiff cannot seek to privately enforce a duty that is owed to the FDA." *Jacob*, 40 F.4th at 1336 (citing

*Mink*, 860 F.3d at 1327). "So, even if a plaintiff's claim is not expressly preempted, it is impliedly preempted if it is cognizable only because of duties owed to the FDA." *Jacob*, 40 F.4th at 1336. "State-law claims based on conduct that violates the [MDA] can escape implied preemption only if the alleged wrongdoing would give rise to liability under state law even if the [MDA] did not exist." *Id.*

The Eleventh Circuit "ha[s] explained that express and implied preemption leave a 'narrow gap' through which a plaintiff's claim must survive: 'a plaintiff has to sue for conduct that violates a federal requirement (avoiding express preemption) but cannot sue only because the conduct violated that federal requirement (avoiding implied preemption).'" *Id.* (quoting *Mink*, 860 F.3d at 1327). "In other words, when a plaintiff's claim implicates the safety or effectiveness of a federally regulated medical device, [the plaintiff's] claim survives preemption so long as [the plaintiff] claims the breach of a well-recognized duty owed to [the plaintiff] under state law and so long as [the plaintiff] can show that [the plaintiff] was harmed by a violation of applicable federal law." *Jacob*, 40 F.4th at 1336 (cleaned up).

"Because preemption is a principle derived from the Supremacy Clause, . . . [federal courts] must first analyze whether each claim can stand under state law, and only then decide the preemption questions where necessary." *Godelia v. Doe 1*, 881 F.3d 1309, 1317 (11th Cir. 2018). "As a result, [the court] will first examine each

claim under [Alabama] law and only if it is viable under [Alabama] law, will [the court] then consider whether it is expressly or impliedly preempted." *Id*.[2]

### 1.  Whether the Fromans Stated A Claim Under Alabama Law

In the Fromans' original complaint, they listed their claims as follows: "(1) design defect; (2) manufacturing defect; (3) strict liability; (4) negligence; (5) gross negligence; and (6) punitive damages." Doc. 1 ¶ 2. In the first amended complaint, which is the operative complaint, the Fromans listed their claims as follows: "(1) Alabama Extended Manufacturer's Liability Doctrine; (2) negligence; (3) strict liability; (4) failure to warn; (5) gross negligence; and (6) punitive damages against each Defendant." Doc. 39 ¶ 2.

More particularly, in Counts 7–11, the Fromans caption their claims against CooperSurgical as follows:

- "Count 7: CooperSurgical – Products Liability – Design Defect – Alabama Extended Manufacturer's Liability Doctrine Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."

---

[2] The Fromans provided persuasive authority from three other district courts to support their assertions that their claims are not preempted. *See* Doc. 57-1; *Blevins-Ellington v. CooperSurgical, Inc.*, No. 1:22-cv-00197-LMM, 2023 WL 2111346 (N.D. Ga. Jan. 17, 2023); Doc. 62-1; *Bergdoll*, 2023 WL 2167417, at *5–6; Doc. 63-1; *Mack*, 2023 WL 2653365, at *7–9. The operative complaint in each of those cases is identical to the complaint that Judge Kallon held was preempted in this action. *Compare* Plaintiff's Second Amended Complaint and Jury Demand, *Blevins-Ellington v. CooperSurgical, Inc.*, No. 1:22-cv-00197-LMM (N.D. Ga. Mar. 7, 2022), ECF No. 17 at 22–45, *and* Plaintiff's Complaint and Jury Demand, *Bergdoll v. CooperSurgical, Inc.*, 6:22-cv-3018-MDH (W.D. Mo. Jan. 20, 2022), ECF No. 1 at 14–29, *and* Plaintiffs' Complaint and Jury Demand, *Mack v. CooperSurgical, Inc.*, 1:22-cv-54-RAH-KFP (M.D. Ala. Jan. 27, 2022), ECF No. 1 at 14–29, *with* Doc. 1 at 15–32; *see also* Doc. 36 (Judge Kallon's opinion). Accordingly, these decisions do not aid this court in discerning whether the Fromans' repleaded allegations are preempted.

- "Count 8: CooperSurgical – Products Liability – Design Defect – Negligence Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."
- "Count 9: CooperSurgical – Strict Liability Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."
- "Count 10: CooperSurgical – Failure to Warn Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."
- "Count 11: CooperSurgical – Gross Negligence Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."
- "Count 12: CooperSurgical – Punitive Damages Based Exclusively on Violations of 21 C.F.R. §§ Parts 803, 814 and 820 *et seq*."

*Id.* at 61, 68, 75, 81, 87, 95 (cleaned up).

CooperSurgical contends that the Fromans have not asserted manufacturing defect claims against it. *See* Doc. 41 at 5 (CooperSurgical's initial brief: the "Fromans' claims . . . do not include any allegations of manufacturing defect"); *accord* Doc. 43 at 3 (CooperSurgical's reply brief: "[The Fromans] bring no claim for a manufacturing defect."). Although the Fromans assert in their opposition that "by failing to adhere to its federal regulatory obligations, [CooperSurgical] . . . manufactured and sold an unreasonably dangerous product," Doc. 42 at 6, the Fromans did not plead a manufacturing defect claim in their amended complaint, and they make no allegation in that pleading that the manufacture of the Filshie Clips Ms. Froman received deviated from the intended design of Filshie Clips, generally. *See generally* Doc. 39.

The court's remaining analysis first explains the relevant Alabama law, and then examines the Fromans' claims.

### a. Alabama Law of Products Liability

"Under the [Alabama Extended Manufacturers Liability Doctrine ('AEMLD')], a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law." *DISA Indus., Inc. v. Bell*, 272 So. 3d 142, 149 (Ala. 2018) (cleaned up). "The AEMLD is a judicially created accommodation of Alabama law to the doctrine of strict liability for damage or injuries caused by allegedly defective products." *Keck v. Dryvit Sys., Inc.*, 830 So. 2d 1, 5 (Ala. 2002).

"A defendant will be liable under the AEMLD if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered and, because of its unreasonably dangerous condition, injures the consumer when put to its intended use." *DISA Indus., Inc.*, 272 So. 3d at 149. "Under the AEMLD, therefore, a defective product is one that is unreasonably dangerous, *i.e.*, one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer." *Id*.

"In an AEMLD action, the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition." *Id*. "Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained." *Id*. "Proof of an accident

and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." *Id*.

"In fashioning the AEMLD, Alabama courts left no doubt that they were dispensing with any notion of no-fault liability (otherwise known as strict liability)." *Foster v. Bridgestone Ams., Inc.*, Civil Action No. 11–0175–WS–N, 2013 WL 489162, at *2 (S.D. Ala. Feb. 8, 2013) (cleaned up) (collecting cases). "[I]nstead . . . Alabama courts altered the traditional strict-liability framework," "leavening it with affirmative defenses and nods to negligence theory." *Id*.

"Federal courts applying Alabama law have consistently and uniformly" held that strict liability claims in the products liability context are not viable under Alabama law. *Id*. at *2 n.2. "If a plaintiff in a products case could go forward on a pure strict liability theory, then there would be no reason for any plaintiff to waste time and energy shouldering the more cumbersome, onerous[,] and rigorous AEMLD burden in addition to (or in lieu of) the strict liability claim." *Id*. at *3 n.3.

Count 9 asserts a strict liability claim. The Fromans assert that "[a] party is liable under strict liability if a product was unacceptably harmful or unsafe at the time it was developed, produced, or marketed" and "arrive[d] at the consumer unaltered, and the defective product harmed the consumer." Doc. 39 ¶ 156. But "courts applying Alabama law have declined to recognize a freestanding cause of action for strict liability in the products liability context, finding instead that any

such claim is actionable only under the aegis of the AEMLD." *Foster*, 2013 WL 489162, at \*2 (collecting cases). Accordingly, the Fromans' strict liability allegations do not state a claim under Alabama law, and Count 9 is **DISMISSED**.

The Fromans assert various claims of negligence separate and apart from the AEMLD. *See generally* Doc. 39 (Counts 8, 10, and 11). Although Alabama law no longer recognizes a claim for strict liability because of the AEMLD, Alabama law continues to recognize claims of negligence. *See*, *e.g.*, *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 35 (Ala. 2003). In *Tillman*, the Alabama Supreme Court answered a certified question posed by the Eleventh Circuit regarding, in relevant part, whether a claim alleging negligence "merge[d] with" the AEMLD. 871 So. 2d at 34–35. The Alabama Supreme Court responded that "the judicially created AEMLD" does not "subsume[] the common-law tort action[] of negligence." *Id*. at 35.

Count 11 asserts a claim for gross negligence. The Fromans assert that "[a] claim for gross negligence must state the same elements required for negligence, the defendant's knowledge of the probable consequences of not taking care, as well as indifference to those consequences." *Id*. ¶ 174. But under Alabama law, "the word 'gross' when used in connection with negligence, implies nothing more than negligence." *Fid.-Phenix Fire Ins. Co. v. Lawler*, 81 So. 2d 908, 912 (Ala. Ct. App. 1955). Because "Alabama law treats gross negligence the same as negligence,"

federal courts "do[] not distinguish between the two." *Crowe v. Johnson & Johnson*, No. 1:21-CV-210-TFM-C, 2022 WL 2161052, at *7 n.6 (S.D. Ala. June 15, 2022) (collecting cases). Accordingly, the court analyzes together all the Fromans' negligence claims. The Fromans assert that CooperSurgical was negligent in two respects: first, in selling a defectively designed product and second, in failing to warn about potential dangers associated with the product. *See generally* Doc. 39 (Counts 7, 8, 10, and 11). The Fromans also assert a freestanding claim for punitive damages (Count 12). The court considers in turn each kind of claim.

### b. Design Defect (Counts 7, 8, and 11)

Alabama law recognizes claims under the AEMLD based on a design defect. *E.g.*, *Yamaha Motor Co. v. Thornton*, 579 So. 2d 619, 621 (Ala. 1991). "To establish liability, a plaintiff must show: . . . he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Id.* (cleaned up). By making such a showing, "the plaintiff has proved a *prima facie* case although . . . the seller has exercised all possible care in the preparation and sale of his product, and . . . the user or consumer has not bought the product from, or entered into any contractual relation with, the seller." *Id*. (cleaned up).

Alabama law also recognizes claims of negligence based on an alleged design defect. *Id.* at 623. "The elements for recovery under a negligence theory are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Id.* (cleaned up). And in Alabama, the "alleged violation the federal Food, Drug & Cosmetic Act . . . and FDA regulations" may serve as evidence of negligence. *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1067–68 (Ala. 1993).

The Fromans allege that "CooperSurgical imported, distributed, marketed, and sold" Filshie Clips, that the Filshie Clips are defective because they "have a propensity to migrate after being placed on the fallopian tubes," and that defect caused Ms. Froman's injuries. Doc. 39 ¶¶ 46, 48, 72. The Fromans further allege that during the premarket approval process, CooperSurgical "reported to the FDA that the Filshie Clip System had a migration incidence of .13%" when "the risk of clip migration was significantly higher and continued to increase from year to year." *Id.* ¶¶ 53–54. The Fromans allege they "have suffered as a result of [CooperSurgical's] failure to comply with the regulations and conditions imposed by the FDA." *Id.* ¶ 52. On its face, these allegations are sufficient to plead claims under the AEMLD and Alabama common law of negligence based on a defective design.

### c.  Failure to Warn (Counts 10 and 11)

Count 10 alleges a failure to warn claim under the AEMLD and a negligence theory. *See* Doc. 39 ¶ 165. Ordinarily, the court would strike Count 10 as a shotgun pleading and order the Fromans to replead because they may not state multiple claims within a singular count. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). But the Fromans already had an opportunity to replead, and the basis for the claims asserted in Count 10 is clear enough to proceed.

"[I]n Alabama[, the] duty to warn is filtered through the 'learned-intermediary doctrine,' which essentially holds that the warning is directed toward the physician who prescribes a drug rather than the patient who takes the drug." *Blackburn v. Shire U.S., Inc.*, No. 1210140, 2022 WL 4588887, at *4 (Ala. Sept. 30, 2022). The learned-intermediary doctrine also applies to manufacturers of medical devices to "bridge the gap in cases where the medical product and its related warning are too complex to be fully appreciated by the patient." *Morguson v. 3M Co.*, 857 So. 2d 796, 802 n.1 (Ala. 2003) (cleaned up).

"A . . . manufacturer fulfills its duty to warn the ultimate users of the risks of its product by providing adequate warnings to the learned intermediaries who" recommend the medical device. *Blackburn*, 2022 WL 4588887, at *5 (cleaned up). "Once that duty is fulfilled, the manufacturer has no further duty to warn the patient

directly." *Id*. (cleaned up). "However, if the warning to the learned intermediary is inadequate or misrepresents the risk, the manufacturer remains liable for the injuries sustained by the patient." *Id*. (cleaned up). "The plaintiff must show that the manufacturer failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury." *Id*. (cleaned up).

CooperSurgical challenges the Fromans' ability to "alleg[e] sufficient causation." Doc. 43 at 4–5. But under binding precedent, that argument is inappropriate at this stage of the proceedings. *See Godelia*, 881 F.3d at 1318–19. In *Godelia*, the district court dismissed the case on the ground that the plaintiff "did not show an adequate nexus between the regulatory violations and [the plaintiff's] injury." *Id*. at 1318. The Eleventh Circuit reversed. *Id*. at 1319.

The Eleventh Circuit reasoned that "[w]hile it may come to pass that [the plaintiff may] ha[ve] a difficult time proving that it was the violations of the MDA regulations that caused a defect in [the plaintiff's medical device], the allegations in [the] complaint [we]re sufficient to state a claim that is plausible on its face." *Id*. at 1318–19. "For example, it is plausible that [the manufacturer's] failure to document and respond to complaints about its products in violation of [the MDA] could have resulted in a defect persisting in [the device] long after [the manufacturer] should have been aware of it." *Id*. at 1319. The Eleventh Circuit "decline[d] . . . to apply a

heightened pleading standard to allegations of causation in medical device claims" and held that the plaintiff's "claims . . . [we]re sufficiently pled." *Id*.

The Fromans allege that CooperSurgical breached its "duty to monitor its product after premarket approval and to discover and report to the FDA any complaints about the product[']s performance . . . of which it became aware." Doc. 39 ¶ 168. On the Fromans' theory, "[t]he FDA's awareness . . . would have led the FDA to take appropriate and timely actions, including . . . changing the labeling on the Filshie Clips [and] issuing warnings about migration." *Id*. ¶ 170. Then, "the medical community . . . would have known about the risks of migration." *Id*. ¶ 171. "If properly warned, the doctors who performed Ms. Froman's tubal ligation procedure would have know about the true risk of migration," and "Ms. Froman would never have agreed to use the Filshie Clips." *Id*. Alternatively, "[e]ven if [Ms. Froman] chose to . . . us[e] the Filshie Clips, she would have been informed and aware of their propensity to migrate." *Id*. But because Ms. Froman was not adequately warned of the Filshie Clips' alleged "propensity to migrate," she was "implanted with the Filshie Clips" which "migrated [and] caused her to experience extreme pain." *Id*. ¶ 172.

It is too early to know whether the Fromans will establish that violations of the MDA regulations caused Ms. Fromans' injuries. *See Godelia*, 881 F.3d at 1318–19. But the Fromans' allegations "are sufficient to state a claim that is plausible on

its face." *Id*. at 1319. Accordingly, the Fromans have stated claims for violation of the duty to warn under Alabama law, and CooperSurgical's motion to dismiss on that basis is **DENIED**.

### d. Punitive Damages (Count 12)

Count 12 asserts a freestanding claim for punitive damages. Under Alabama law, "there is no such thing as a 'claim of punitive damages.'" *Hines v. Riverside Chevrolet-Olds, Inc.*, 655 So. 2d 909, 925 (Ala. 1994), *overruled on unrelated grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998). "Rather, there are claims on which [Alabama] law authorizes the trier of fact to impose punitive damages if certain wrongfulness is proved by a sufficient weight of the evidence." *Hines*, 655 So. 2d at 925.

The Fromans allege that CooperSurgical's alleged "violation of . . . federal and regulatory requirements . . . establishes a showing of fraud, malice, wantonness, and oppression." Doc. 39 ¶ 195. But Count 12 provides no allegations about "fraud, malice, wantonness, and oppression" other than reciting each word's definition. *See id*. ¶ 185. And the Fromans have not alleged elsewhere in the complaint any facts about fraud, malice, or oppression, let alone at the heightened pleading standard required for some of those claims. *See generally* Doc. 39; *see also* Fed. R. Civ. P. 9(b). Accordingly, Count 12 is **DISMISSED** both as conclusory and for failure to state a claim under Alabama law.

### 2.  Whether the Fromans' Claims Are Preempted

Having determined which of the Fromans' claims are "viable under [Alabama] law," the court next "consider[s] whether" the following claims are "expressly or impliedly preempted": (1) design defect under the AEMLD (Count 7) and negligence (Count 8 and Count 11), (2) failure to warn under the AEMLD (Count 10) and negligence (Count 10 and Count 11). *See Godelia*, 881 F.3d at 1317.

### a.  Design Defect (Counts 7, 8, and 11)

The parties focus their preemption arguments on different aspects of the Fromans' design defect claims. *Compare* Doc. 41 at 3, *with* Doc. 42 at 13. The court first considers the arguments of CooperSurgical and then discusses the arguments made by the Fromans.

According to CooperSurgical, "[the Fromans] allege that [CooperSurgical's] fail[ure to report serious injuries, product complaints, and changes in the incidences of migration rates to the FDA] caused their injury[] because . . . in the absence of those reports to the FDA, the FDA did not require a design change in the Filshie [C]lips." Doc. 41 at 3. "Thus," according to CooperSurgical, "[the Fromans'] claims, at their core, are that the FDA should have required [CooperSurgical] to do something different than what it did." *Id*.; *see also* Doc. 43 at 3.

Under binding precedent, the allegations that the FDA should not have approved the design of Filshie Clips or should have withdrawn its approval are

expressly preempted. In *Reigel v. Medtronic, Inc.*, the Supreme Court held that the plaintiffs' negligent design claims were expressly preempted under the MDA because the FDA gave the device premarket approval. 552 U.S. 312, 325 (2008). The Supreme Court observed that "[p]remarket approval is a rigorous process," *id*. at 317 (cleaned up), and that "the FDA may grant premarket approval only after it determines that a device offers a reasonable assurance of safety and effectiveness," *id*. at 323. Accordingly, "[s]tate tort law that requires a manufacturer's [medical device] to be safer . . . than the model the FDA has approved disrupts the federal scheme" because "[a] jury . . . sees only the cost of a more dangerous design[] and is not concerned with its benefits." *Id*. at 325.

The parties do not cite any binding precedent regarding the viability of a design defect claim post-*Reigel*, and the court's review of Eleventh Circuit caselaw reveals no such authority. The Eleventh Circuit has, however, described the requirements for a properly pleaded manufacturing defect claim, *see Jacob*, 40 F.4th at 1338; *see also Mink*, 860 F.3d at 1331, and these decisions offer guidance.

In *Jacob*, the Eleventh Circuit concluded that a plaintiff's manufacturing defect claim was not expressly preempted where "[t]he heart of [the] claim [wa]s that because [the device manufacturer] failed to follow specifications required by the FDA, her [medical device] w[as] defective and w[as] further vulnerable to degradation, deterioration, rupture and leakage." 40 F.4th at 1338. And in *Mink*, the

43

Eleventh Circuit held that a plaintiff properly pleaded a manufacturing defect claim where the plaintiff alleged that his medical device "was manufactured with materials that did not meet the FDA's requirements" and that "these defects were the . . . cause of his injuries." 860 F.3d at 1331.

Precedent from other circuits offer similar guidance. *See In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*, 623 F.3d 1200, 1206 (8th Cir. 2010); *Horn v. Thoratec Corp.*, 376 F.3d 163, 176–77 (3d Cir. 2004); *Otis-Wisher v. Medtronic, Inc.*, 616 F. App'x 433 (2d Cir. 2015); *Rodriguez v. Am. Med. Sys., Inc.*, 597 F. App'x 226, 229–30 (5th Cir. 2014); *Jones v. Medtronic, Inc.*, 745 F. App'x 714, 718 (9th Cir. 2018), *as amended on denial of reh'g* (Sept. 7, 2018). The Fifth Circuit summarizes the law regarding design defect claims post-*Reigel* as follows: "if a plaintiff pleads that a manufacturer of a Class III medical device failed to comply with . . . the specific processes and procedures that were approved by the FDA . . . and that this failure caused the injury, the plaintiff will have pleaded a parallel [design defect] claim" and such claim is not expressly preempted. *Rodriguez*, 597 F. App'x at 229 (quoting *Bass v. Stryker Corp.*, 669 F.3d 501, 512 (5th Cir. 2012)). Put differently by the Eighth Circuit, "[a]bsent concrete allegations that the product sold by [the device manufacturer] was not the product design approved" by the FDA, a design defect claim is simply an "attack[] on the risk/benefit analysis that led the

FDA to approve an inherently dangerous Class III device" and is "expressly preempted." *In re Medtronic, Inc.*, 623 F.3d at 1206.

The Fromans do not allege that CooperSurgical deviated from the FDA-approved design. *See generally* Doc. 39. Because the FDA approved the Filshie Clips design, *see* Doc. 39 ¶¶ 21–23, and litigants may not use "[s]tate tort law" to supersede "the cost-benefit analysis . . . applied by the experts at the FDA," *Riegel*, 522 U.S. at 323–25, the Fromans' claims that Filshie Clips were defective because CooperSurgical failed to submit report injuries to the FDA, which prevented the FDA from requiring a different design, are expressly preempted. *See id.*

The court turns next to the aspects of the design defect claims that the Fromans emphasize. The Fromans assert that their design defect claims are not preempted because the "claims are based on several federal regulation violations, only one of which is [CooperSurgical's] failure to report to the FDA." Doc. 42 at 13. But the Fromans pleaded and repeatedly have explained their design defect claims in a way that makes clear that CooperSurgical's alleged failure to make required disclosures to the FDA is the basis for the harm Ms. Froman experienced, regardless of what specific duty CooperSurgical breached when it failed to make required disclosures.

For example, in Count 10 the Fromans assert that if CooperSurgical had complied with applicable federal regulations, "CooperSurgical would have properly informed the FDA of the[ Filshie Clips'] defects and the FDA would have known

about the true potential for migration of these Filshie Clips and the dangers patients

were exposed to and the injuries that" patients experienced "as a result of the Filshie

Clips." Doc. 39 ¶ 143. The Fromans further assert that "[t]he FDA's awareness of

any of these matters would have led the FDA to take appropriate and timely actions."

*Id*. And in opposition to CooperSurgical's motion to dismiss, the Fromans explain

their design defect claim as follows:

> By failing to adhere to the FDA regulations, [CooperSurgical] . . . did
> not properly display hazards, warning, precautions on the Filshie Clips,
> did not have a proper corrective and preventative action plan to address
> complaints about the Filshie Clips, did not properly investigate or
> remedy those adverse events, and did not properly and timely report
> such events to the FDA. Had [CooperSurgical] properly reported this
> information pursuant to the federal regulations, the FDA would have
> been properly aware of the Filshie clip's true migration rate . . . which
> could have led to the FDA taking appropriate and timely actions . . . ,
> including but not limited to warning healthcare professionals or
> patients, changing the labels on the Filshie Clips, halting sales, or even
> recalling Filshie Clips.

Doc. 42 at 6 (cleaned up). Thus, according to the Fromans, CooperSurgical's failure

to report information to the FDA is the reason that the FDA did not require an

alternative design or take other measures to prevent the harm Ms. Froman

experienced. *See id.*

Put differently, the Fromans have not alleged a factual basis for their design

defect claims that is independent of CooperSurgical's alleged failure to make certain

disclosures to the FDA. The common denominator of all the regulatory violations

the Fromans assert is the allegation that if CooperSurgical had complied with the

46

regulations, CooperSurgical would have alerted the FDA to problems with the Filshie Clips such that the FDA would have changed its conduct and Ms. Froman would not have been injured. *See id*.

Under binding precedent, these claims are impliedly preempted. *See Godelia*, 881 F.3d at 1320; *accord Mink*, 860 F.3d at 1330. In *Mink*, the Eleventh Circuit affirmed the district court's holding that a plaintiff's negligence claim based on a "failure to report theory [wa]s impliedly preempted." 860 F.3d at 1329–30. The plaintiff alleged that a medical device manufacturer was negligent because the manufacturer "failed to adequately investigate adverse events and complaints and failed to properly report these issues to the FDA." *Id*. at 1330 (cleaned up). "Because this theory of liability is based on a duty to file a report with the FDA," the Eleventh Circuit held that "federal law preempts [this] claim[]." *Id*.

In *Godelia*, the Eleventh Circuit reversed a district court's conclusion that the MDA impliedly preempted the plaintiff's manufacturing defect claim. *Godelia*, 881 F.3d at 1320. In that case, the plaintiff brought a manufacturing defect claim under theories of strict liability and negligence. *Id*. at 1317. The plaintiff alleged that the medical device manufacturer violated several federal regulations, including the "failure to report . . . information . . . that reasonably suggests that a device . . . [is] likely to cause or contribute to a death or serious injury" to the FDA. *Id*. at 1315 & 1315 n.1 (cleaned up). The Eleventh Circuit held that the plaintiff's claims "based

on a manufacturing defect" were not preempted because "a manufacturer's duty includes the duty to inspect and test," irrespective of the MDA. *Id*. at 1320. The Eleventh Circuit observed that the plaintiff's "claims would have been impliedly preempted if he were asking the court to find [the manufacturer] liable based solely on a failure to report to the FDA." *Id*.

This case is like *Mink* in that the Fromans are trying to use their allegations about duties other than disclosure duties to argue that their theory of lability is not based on CooperSurgical's alleged failure to make disclosures to the FDA. *Compare id*., *with* Doc. 42 at 6. But here, as in *Mink*, without the alleged failure to report, which the Fromans allege would have made the FDA act differently, the rest of the Fromans' theory falls apart. Accordingly, CooperSurgical's motion to dismiss the Fromans' claims based on allegedly defective design (Counts 7, 8, and 11) as either expressly or impliedly preempted is **GRANTED**.

### b. Failure to Warn Claims (Counts 10 and 11)

"The [FDA's] premarket approval process includes review of the device's proposed labeling." *Riegel*, 552 U.S. at 318. "The FDA evaluates safety and effectiveness under the conditions of use set forth on the label[] . . . and must determine that the proposed labeling is neither false nor misleading." *Id*. "Once a device has received premarket approval, the MDA forbids the manufacturer to make,

without FDA permission, changes in . . . labeling . . . that would affect [its] safety or effectiveness." *Id*. at 319.

The Fromans do not allege that CooperSurgical deviated from the FDA-approved label. *See generally* Doc. 39. To the extent that the Fromans challenge whether the FDA-approved label has sufficient warnings, such claims are expressly preempted by the FDA's premarket approval of those warnings. *See Riegel*, 552 U.S. at 324–25.

CooperSurgical asserts that the Fromans' failure to warn claims are impliedly preempted because "[the Fromans'] claims are all based on . . . duties owed to the FDA" and "are not private causes of action." Doc. 41 at 6. According to CooperSurgical, the Fromans allege that "the [premarket] approved . . . labeling and warnings accompanying [Filshie Clips] would have been changed by the FDA if [CooperSurgical] had not allegedly breached [its] duties to report product complaints and unpublished literature and studies to the FDA." *Id*.

The Fromans respond that their "claims are not entirely based on [CooperSurgical's] failure to report adverse events to the FDA." Doc. 42 at 10 (capitalization altered). Here again, the Fromans are attempting to use their allegations about duties other than disclosure duties to suggest that their theory of liability is not based entirely on CooperSurgical's alleged failure to make required disclosures to the FDA. Although the Fromans allege that CooperSurgical breached

a variety of duties imposed by federal regulations, *see*, *e.g.*, Doc. 39 ¶ 168, the Fromans' failure to warn claim rises and falls entirely on CooperSurgical's alleged breach of its "duty to monitor its product after premarket approval and to discover and report to the FDA any complaints about the product[']s performance . . . of which it became aware," *id*. ¶¶ 170–72. Put differently, the Fromans plead no factual basis for their failure to warn claims that is independent of CooperSurgical's alleged failure to make certain disclosures to the FDA. *See id*.

Only the FDA can bring a cause of action for a manufacturer's failure to make disclosures to the FDA. *See Mink*, 860 F.3d at 1327, 1330. In that respect, like the impliedly preempted defective design claims in *Mink*, the Fromans' failure to warn claims are based on allegations that CooperSurgical "failed to adequately investigate adverse events and complaints and failed to properly report these issues to the FDA." *Id*. at 1330 (cleaned up); *accord Godelia*, 881 F.3d at 1320 ("[The plaintiff's] claims would have been impliedly preempted if he were asking the court to find [the device manufacturer] liable based solely on a failure to report to the FDA . . . ."). Accordingly, CooperSurgical's motion to dismiss is **GRANTED**.

## IV.   CONCLUSION

For the foregoing reasons, Femcare's motion to dismiss is **GRANTED**. The Fromans' request for leave to conduct jurisdictional discovery is **DENIED**. The

Fromans' motion to strike is **DENIED**. CooperSurgical's motion for leave to file its reply brief out of time is **GRANTED**.

CooperSurgical's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The motion to dismiss is **DENIED** to the extent CooperSurgical asserts that the Fromans have failed to state a claim under Alabama law. The motion is **GRANTED** to the extent CooperSurgical asserts that all claims asserted against it are preempted by federal law. The Clerk of Court is **DIRECTED** to close this case.

**DONE** and **ORDERED** this 29th day of March, 2023.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE